ANGELO V. BERLANDI vs. COMMONWEALTH
(and a companion case [1]).

Suffolk.    May 19, 1941. — July 15, 1943.

Present: FIELD, C.J., DONAHUE, DOLAN, & RONAN, JJ.

*Contempt. District Court*, Jurisdiction. *Conspiracy. Error, Writ of.
Practice, Criminal*, Contempt proceedings, View. *Constitutional Law*,
Due process of law, Impartial tribunal. *Error*, Whether error harmful.

A sentence for a criminal contempt is a "judgment in a criminal case"
which may be reviewed by writ of error under G. L. (Ter. Ed.) c. 250,
§ 9.

A prosecution for larceny in a District Court, after conviction and appeal
to the Superior Court, remained pending in the District Court to an
extent sufficient to give that court jurisdiction to adjudge in contempt
one who then attempted improperly to influence the presiding judge
to dismiss the case and discharge the defendant if the appeal were
withdrawn.

The mere fact that a conspiracy was an element leading up to an attempt
to obstruct the administration of justice in a District Court did not
preclude that court from punishing such conduct as contempt al-
though it had no jurisdiction to punish a conspiracy as an independent
criminal offence.

Rulings as to admission of evidence at the trial of a criminal contempt
proceeding, assigned as errors in a petition for a writ of error to re-
view the judgment of contempt but not set forth in the return to the
writ filed with a plea in nullo est erratum, were not subject to review.

A judge of a District Court who had heard a larceny case committed no
error in himself also hearing on the merits a complaint for contempt
against one who, pursuant to a conspiracy with others, by misrepre-
sentations to the judge attempted improperly to influence him to act
in a certain manner in the larceny case, or in refusing in the contempt
proceeding to submit to cross-examination upon an issue of fact as
to a conversation with the alleged contemnor in which such misrepre-
sentations were made.

A judge of a District Court, hearing on the merits a complaint for con-
tempt, may take a view.

No prejudicial error appeared in the conduct of a judge of a District
Court, in that, after the conclusion of the formal hearing on the
merits of a complaint for contempt of court, he took a view without
the consent, knowledge, or presence of the defendant or his counsel,

---

[1] The companion case is Harold J. Walkins *vs.* Commonwealth.

where it appeared that what the judge saw on the view did not in any way affect his decision.

A judge of a District Court was not disqualified on the ground of partiality from himself hearing on the merits a complaint for contempt of court committed in seeking to obstruct justice through misrepresentations made to him.

Both a police officer and a brother of one, known to both to have been justly convicted of larceny by a judge of a District Court, were guilty of contempt of court where, pursuant to a conspiracy on their part to obstruct justice by procuring a third person to "take the rap" and by fraudulently securing a release of the convicted man, the police officer truly stated to the judge that the third person had pleaded guilty to the larceny charge but impliedly misrepresented to the judge that he believed the convicted man innocent and sought to induce the judge to take action resulting in his release; the fact that the conspiracy and attempt to obstruct justice were unsuccessful was immaterial.

Both of two conspirators, fraudulently seeking to obstruct justice, were guilty of contempt of court although overt acts were committed by only one of them.

Dishonest and fraudulent communications with a trial judge in an effort to obstruct justice were not less contempt of court because they were made as a favor to a friend.

PETITIONS for writs of error, filed in the Supreme Judicial Court for the county of Suffolk on July 30, 1940.

Pursuant to the petitions, writs issued to the Chief Justice of the Municipal Court of the City of Boston on July 30, 1940. The defendant in error pleaded in nullo est erratum.

The cases were heard by *Lummus*, J.

In his return, the Chief Justice of the Municipal Court of the City of Boston, with respect to the phrase, "take the rap," stated: "To 'take the rap' is a phrase well known in criminal and police circles. The process of 'taking the rap' may take different forms, but in substance it often consists of someone who is interested in the freeing of a given prisoner persuading some other person to come into court, or into the hands of the police, and confess (usually untruthfully) to the commission of the crime, in the hope that the person under arrest will be set at liberty. Normally the person in custody has a bad criminal record, and the person who comes in to 'take the rap' has no criminal record and may therefore reasonably expect to be given

a light sentence or be placed upon probation as a first offender."

*J. E. Hannigan,* (*E. M. McMahon* with him,) for Walkins.

*A. F. Bickford,* (*J. S. Dawson* with him,) for Berlandi.

*J. Lewiton,* Assistant Attorney General, for the Commonwealth.

FIELD, C.J.   These are two petitions for writs of error brought in the Supreme Judicial Court, each of them to review a judgment for criminal contempt against the petitioner in the Municipal Court of the City of Boston whereby the petitioner was sentenced to punishment for such contempt.   The petitioners are respectively Angelo V. Berlandi and Harold J. Walkins.   The petitions were heard together by a justice of this court sitting as a single justice. In each case he made rulings of law and ordered the judgment affirmed.   At the request of the petitioner in each case the single justice reported the case and the questions of law involved therein for the determination of the full court.   It was agreed by the parties — and this agreement was approved by the court — that the "papers in the Berlandi case are to be printed and wherever a difference in substance or material difference in form occurs in the . Walkins case, the companion case, those portions of the Walkins case will be printed in full and indicated by italics. Portions of the record indicated as appearing in assignments or other pleadings or documents filed by or in behalf of one petitioner but not in those filed by or in behalf of the other petitioner shall be considered only as to the petitioner in whose case they were included."

The cases, in accordance with established practice, were heard by a single justice upon the petitions of the respective petitioners, incorporating the petitioners' assignments of error, and the returns as extended of the Chief Justice of the Municipal Court of the City of Boston.   The practice in such cases was recently considered in *Dolan* v. *Commonwealth,* 304 Mass. 325, where reference was made to previous cases.   The discussion need not be repeated here in detail.   In accordance with the decision in that case, supported by the authority of previous cases, a sentence to

punishment for a criminal contempt is a "judgment in a criminal case" that, under G. L. (Ter. Ed.) c. 250, § 9, may be reviewed on writ of error subject to the ordinary limitations upon review by writ of error. Such a review, except for matters not here material, is of matters of law apparent on the record of the court in which the judgment was entered as disclosed by the return. Pages 331–336.

The petitioners arrange their assignments of error for the purpose of argument in seven different groups, some of the assignments of error being included in more than one group. The propositions of law argued will be treated in accordance with this grouping of assignments of error, and the material facts will be stated in connection with the discussion of the principles of law arising upon such facts respectively.

First. The petitioners contend that the "Municipal Court lacked jurisdiction to convict the defendants [the petitioners here] Walkins and Berlandi."

These facts bearing upon this contention appear from the record of the Municipal Court as disclosed by the returns: One Alfred A. Berlandi — sometimes described in the decision of the Chief Justice of the Municipal Court and in this opinion as "Freddy" — was complained against, in the Municipal Court of the City of Boston, for larceny from the person — the larceny of a hand bag from one O'Donnell. On Monday, March 18, 1940, he was arraigned in the first criminal session of that court before the Chief Justice thereof. When the case was reached for trial before the Chief Justice, a motion for a continuance was denied by him and the case was tried by him. The defendant was found guilty and sentenced to the house of correction for three months. The defendant appealed and the Chief Justice set bail at $1,500 which was furnished. These proceedings took place on March 18, 1940. On Wednesday, March 20, 1940, one Carmen Giordano was complained against in the Municipal Court of the City of Boston for larceny of a hand bag, was arraigned before the Chief Justice and pleaded guilty. (It is apparent from the record that the complaint against Alfred A. Berlandi and that against Car-

men Giordano related to the same hand bag.) The Chief Justice declined jurisdiction and held the defendant in $500 bail for the grand jury. He furnished bail. This defendant was indicted by the grand jury, and on April 17 and 18, 1940, his case and that of Alfred A. Berlandi, on appeal, were tried together in the Superior Court before a judge and a jury. Alfred A. Berlandi was convicted and sentenced to three months in the house of correction. At the close of the evidence Giordano pleaded guilty and was placed on probation with a suspended sentence of three months in the house of correction.

An assistant district attorney filed complaints in the Municipal Court on May 17, 1940, against the present petitioners, and also against Alfred A. Berlandi and Carmen Giordano, charging each of them with criminal contempt in connection with the cases of Alfred A. Berlandi and Carmen Giordano. The complaint against each of the petitioners, after alleging facts in considerable detail, alleged that the conduct of each of them respectively "as hereinbefore set forth tended to interfere with, impede and obstruct the proper administration of justice and constituted contempt of this Honorable Court." Process was duly issued and served upon each of the four persons charged with criminal contempt to bring him before the court. Each of the petitioners and Alfred A. Berlandi pleaded not guilty. Giordano pleaded guilty. After a hearing before the Chief Justice of the Municipal Court on July 30, 1940, he found the petitioners and Alfred A. Berlandi guilty of contempt, and sentenced each of the four persons complained against to be confined in the common jail — in the case of the petitioner Walkins for six months, and of the petitioner Berlandi for nine months. Though the decision of the Chief Justice set forth in the record related to all four persons charged with criminal contempt, the present petitions relate only to the convictions for contempt of Angelo V. Berlandi and Walkins, respectively.

The Chief Justice — as appears from his decision incorporated in the record of the Municipal Court — found specific facts with respect to the conduct of the four per-

sons charged with criminal contempt before and after the conviction of Alfred A. Berlandi. With respect to the conduct of the petitioner Walkins, the Chief Justice found, among others, the following facts: "Sometime . . . on the forenoon of Tuesday, March 19, Walkins came into the first criminal session of the Municipal Court while I was sitting on the bench. He would have me believe that he did not then know the strength of the Commonwealth's case against Freddy. I do not so believe. I find that he had every reason to believe, and did then believe, that Freddy was guilty. He secured my attention during some interval between trials and represented to me that another man had confessed to the larceny of which I had found Freddy guilty on the day before and asked me to allow Freddy to withdraw his appeal and to revoke my finding of guilty. This he himself admits having done. He then said something further to me. He testified that what he said further was to ask me to continue Freddy's case so that it might be tried with the case of the other man who had confessed. My own recollection of what he further asked me was that he wanted me to dismiss the case against Freddy." The Chief Justice found further that the four persons charged with criminal contempt "conspired and attempted to obstruct and impede the administration of justice in this court by trying to secure, through action on my part, the freedom of the defendant Alfred A. Berlandi, a guilty man and known to them to be guilty, in the manner hereinabove described [in the decision], and that they are guilty of contempt. The fact that their said conspiracy and attempt to secure said freedom was unsuccessful makes no difference." Further findings with respect to the conduct of the petitioner Walkins and the conduct of the petitioner Berlandi in connection with the conduct of the petitioner Walkins will be stated so far as essential in the course of the discussion of other contentions of the petitioners.

1. The contention of the petitioners that the Municipal Court lacked jurisdiction to convict the petitioners is based, in part, on the contention that, at the time the petitioner Walkins made the representations to the Chief Justice and

the request of him herein referred to with respect to Alfred A. Berlandi, the case against said Berlandi was not "pending" for action in the Municipal Court.

The single justice of this court ruled against the contention that the Municipal Court was without jurisdiction on this ground. This ruling was right.

This contention of the petitioners has a twofold aspect: (a) that the acts of the petitioner Walkins for which he was convicted for criminal contempt, and for connection with which the petitioner·Berlandi was so convicted, having been performed after Alfred A. Berlandi was convicted upon the complaint against him for larceny and had appealed to the Superior Court, were performed too late for the Municipal Court to have jurisdiction to punish therefor, and (b) that these acts, having been performed after the appeal to the Superior Court and when such appeal had not been withdrawn, were performed too early for the Municipal Court to have such jurisdiction, as that court never acquired such jurisdiction since the circumstance that might have given it jurisdiction never arose. In other words, the contention is that the jurisdiction of the Municipal Court to punish for contempt ceased with the conviction, so far as acts performed thereafter were concerned, and that such jurisdiction was never revived by a withdrawal of the appeal.

We need not discuss the question of pendency generally. We assume, however, in favor of the petitioners, that a court ordinarily, if not universally, has no jurisdiction to convict for criminal contempt by reason of acts performed with relation to a case after there has been a final adjudication of the case in that court and that court has ceased to have jurisdiction to deal with the case. See *Globe Newspaper Co.* v. *Commonwealth*, 188 Mass. 449, 450. The petitioners, however, properly do not contend that this principle extends to the exclusion from the jurisdiction of a court of a complaint for criminal contempt based upon acts performed in connection with a proceeding in that court while it was pending there, by reason of the fact that the original proceeding was finally adjudicated in that court before the complaint was heard or even before it was filed. Though a

proceeding for criminal contempt arises out of another pro-
ceeding, it is not a part thereof but is an independent pro-
ceeding. *Blankenburg* v. *Commonwealth*, 260 Mass. 369,
372. *Gompers* v. *Bucks Stove & Range Co.* 221 U. S. 418,
451. *Leman* v. *Krentler-Arnold Hinge Last Co.* 284 U. S.
448, 453. *Clarke's Case*, 12 Cush. 320, and *Piper* v. *Pear-
son*, 2 Gray, 120, are distinguishable.

The sentence imposed upon Alfred A. Berlandi in the
Municipal Court upon the complaint against him for lar-
ceny was a final judgment of that court upon such com-
plaint subject, however, to appeal to the Superior Court.
For most purposes such a judgment is the end of the case
so far as the jurisdiction of the Municipal Court is concerned
whether or not an appeal therefrom is taken. G. L. (Ter.
Ed.) c. 278, §§ 18–24. *Commonwealth* v. *Dascalakis*, 246
Mass. 12, 19. But this is not so for all purposes. Under
G. L. (Ter. Ed.) c. 278, § 25, as amended by St. 1937, c. 311,
set forth in a footnote, [1] the Municipal Court had jurisdic-
tion to receive the personal withdrawal of the appeal of
Alfred A. Berlandi and to determine whether to "order the
appellant to comply with the sentence appealed from" or
to "revise or revoke" it, but had no jurisdiction to "increase
the sentence as first imposed." Obviously, upon such a
personal withdrawal of an appeal the case would be within
the jurisdiction of the Municipal Court for the purpose of

---

[1] "The appellant may, at any time before the next sitting of the superior
court for criminal business and at any time thereafter if no action shall have
been taken by the superior court except continuance, come personally before
the court or trial justice from whose judgment the appeal was taken and
withdraw his appeal. If the appellant has been committed, the officer in
charge of the jail, within forty-eight hours after his commitment, shall notify
him of his right to withdraw his appeal and shall furnish him with a blank
form of withdrawal, which, if signed by him, shall be witnessed by said offi-
cer; thereupon, or if prior to said notice the appellant notifies the said officer
of his desire to withdraw his appeal, the said officer shall forward the defend-
ant, with the signed form of withdrawal, to the court or trial justice before
whom the appeal was taken. In such case the court or trial justice may order
the appellant to comply with the sentence appealed from, in the same manner
as if it were then first imposed, or may revise or revoke the same if satisfied
that cause for such revision or revocation exists; provided, that the court or
trial justice shall not increase the sentence as first imposed, and if sureties
had recognized with the appellant to prosecute his appeal they shall be dis-
charged. If the copy of the record of conviction has been transmitted to the
superior court, the court or trial justice shall notify the clerk of the superior
court of the withdrawal of the appeal, who shall thereupon make a memoran-
dum thereof upon the record of the superior court."

further disposition and would then be "pending" in that court. The petitioners contend, however, that such jurisdiction of the case is conditional upon withdrawal of the appeal, and that, prior to such withdrawal, the case was not "pending" in the Municipal Court in such a sense that acts then performed could constitute ground for punishment for contempt by that court.

It is settled by decisions of this court that the power to punish for contempt arises at an early stage in a case. In *Globe Newspaper Co.* v. *Commonwealth*, 188 Mass. 449, 450, a conviction for contempt for acts performed at a time when, though an indictment had been found, trial thereon was "not then in progress, nor immediately to be begun, but . . . [was] to occur at a time to be afterwards fixed," was sustained. See also *Dolan* v. *Commonwealth*, 304 Mass. 325, 329. In the *Globe Newspaper Co.* case — a case dealing with publication in a newspaper — the court relied upon and quoted with apparent approval from *Rex* v. *Parke*, [1903] 2 K. B. 432, where there was a conviction for contempt for a publication in a newspaper. This court said: "In *Rex* v. *Parke*, [1903] 2 K. B. 432, the publication in a newspaper was made before one accused of murder was even indicted. It was contended that as no cause was pending in the high court, and it was not certain that there would be an indictment, the high court had no jurisdiction to fine the publisher for contempt. Proceedings having been instituted before a magistrate, it was held, after the fullest consideration, that the court had jurisdiction, and punishment was inflicted. Wills, J., said in the opinion: 'Great stress has been laid upon an expression which has been used in the judgments upon questions of this kind — that the remedy exists when there is a cause pending in the court. We think undue importance has been attached to it. . . . It is possible very effectually to poison the fountain of justice before it begins to flow. It is not possible to do so when the stream has ceased.'" See also *Rex* v. *Davies*, [1906] 1 K. B. 32, 35. Whether or not the statement quoted from the *Parke* case ought to be followed to its full extent, the general principle therein stated cannot

rightly be questioned and is applicable to the present cases.

Acts relating to the administration of justice that constitute punishable criminal contempts are those that tend to "obstruct or to degrade" such administration, particularly by interference with the "capacity [of the court] to determine the rights of parties according to law." *Blankenburg* v. *Commonwealth*, 260 Mass. 369, 373; *S. C.* 272 Mass. 25, 29, 32. See also *Globe Newspaper Co.* v. *Commonwealth*, 188 Mass. 449–450. And it was said in *Telegram Newspaper Co.* v. *Commonwealth*, 172 Mass. 294, 300, referring to a case tried on evidence, that it "is an inevitable perversion of the proper administration of justice to attempt to influence the judge or jury in the determination of a cause pending before them by statements outside of the court room, and not in the presence of the parties, which may be false and even if they are true are in law not admissible as evidence."

Many of the cases in which the limitation of the power of a court to punish for contempt to cases "pending" in that court has been discussed — including some of the cases relied on by the petitioners — were cases relating to publication in a newspaper. The present cases are not of this nature. The acts of the petitioners for which they were adjudged to be in contempt — whether or not direct contempts in the technical sense (*Hurley* v. *Commonwealth*, 188 Mass. 443, 446; *Blankenburg* v. *Commonwealth*, 272 Mass. 25, 34–35) — were direct attempts, not publication in a newspaper, to influence the decision of a judge. No question is here involved, as might be true if the alleged contempt was publication in a newspaper, of freedom of speech or of the press, particularly comment upon judicial action. See *Bridges* v. *California*, 314 U. S. 252. Nor is any question here involved of the scope of a statute like the Federal statute restricting the power of the lower Federal courts to punish for criminal contempt that was dealt with in some of the cases in the Supreme Court of the United States. See *Toledo Newspaper Co.* v. *United States*, 247 U. S. 402, overruled by *Nye* v. *United States*, 313 U. S. 33. Compare *Opinion of the Justices, post,* 767, 777–778, 779–782. Most,

if not all, of the cases in the Supreme Court of the United States involved one or the other of these questions and consequently furnish little aid in the decision of the questions presented by the present cases. Some of the cases in the Supreme Court of the United States expressly recognize the governing principle of "pendency," though particularly with respect to publication in a newspaper — a matter not here involved.

In *Patterson* v. *Colorado*, 205 U. S. 454, where there was a publication in a newspaper, before the time for motions for rehearing had expired, for which there was a judgment for contempt in a State court, a writ of error to review that judgment was dismissed by the Supreme Court of the United States, in substance, on the ground that no Federal question was presented. That court said, speaking by Mr. Justice Holmes, that "Whether a case shall be regarded as pending while it is possible that a petition for rehearing may be filed, or, if in an appellate court, until the remittitur is issued, are questions which the local law can settle as it pleases without interference from the Constitution of the United States" (page 460), that "The theory of our system is that the conclusions to be reached in a case will be induced only by evidence and argument in open court, and not by any outside influence, whether of private talk or public print" (page 462), and that "if a court regards, as it may, a publication concerning a matter of law pending before it, as tending toward . . . an interference [with its administration of the law], it may punish it . . . . When a case is finished, courts are subject to the same criticism as other people, but the propriety and necessity of preventing interference with the course of justice by premature statement, argument or intimidation hardly can be denied." Page 463.

The petitioners rely particularly upon language in a dissenting opinion in the case of *Craig* v. *Hecht*, 263 U. S. 255. That case arose upon a petition for a writ of habeas corpus brought before a single judge sitting in the District Court to review a conviction for contempt entered by another judge sitting in the District Court based on publication of a letter

in a newspaper while a receivership proceeding was pending. The Federal statute relating to criminal contempts was involved. The Supreme Court of the United States by a majority opinion held that the petition for a writ of habeas corpus was not a proper method by which to review the conviction for contempt. Mr. Chief Justice Taft in a separate opinion concurred in the opinion of the court upon the procedural question, but said further that "it is . . . essential that courts and judges should not be impeded in the conduct of judicial business by publications having the direct tendency and effect of obstructing the enforcement of their orders and judgments, or of impairing the justice and impartiality of verdicts," and that if "the publication is intended and calculated to obstruct and embarrass the court in a pending proceeding in the matter of the rendition of an impartial verdict, or in the carrying out of its orders and judgment, the court may, and it is its duty to protect the administration of justice by punishment of the offender for contempt." Page 278. Mr. Justice Holmes, however, dissented in an opinion in which Mr. Justice Brandeis concurred. He said in part: "I think that the petitioner's resort to habeas corpus in this case was right and was the only proper course. . . . I think that the sentence from which the petitioner seeks relief was more than an abuse of power. I think it should be held wholly void. I think in the first place that there was no matter pending before the Court in the sense that it must be to make this kind of contempt possible. It is not enough that somebody may hereafter move to have something done. There was nothing then awaiting decision when the petitioner's letter was published. . . . But if there had been, and giving the most unfavorable interpretation to all that the letter says, I do not see how to misstate past matters of fact of the sort charged here could be said to obstruct the administration of justice. . . . Even if feeling was tense there is no such thing as what Keating, J., in *Metzler* v. *Gounod* [30 L.T. (N.S.) 264] calls contingent contempt. A man cannot be summarily laid by the heels because his words may make public feeling more unfavorable in case the judge should be asked to act at some later date,

any more than he can for exciting public feeling against a judge for what he already has done." Pages 280–282.

In the case of *Bridges* v. *California*, 314 U. S. 252, in which the Supreme Court of the United States reversed convictions for contempt by a State court for several publications in newspapers on the ground of interference by the convictions with freedom of speech and of the press, it was said in a dissenting opinion with respect to pendency: "The litigation must be immediately pending. When a case is pending is not a technical, lawyer's problem, but is to be determined by the substantial realities of the specific situation." Pages 303–304. In a footnote to the latter statement in the dissenting opinion appears the following: "The present cases are very different from the situation that evoked dissent in *Craig* v. *Hecht*, 263 U. S. 255, 281: 'It is not enough that somebody may hereafter move to have something done. There was nothing then awaiting decision when the petitioner's letter was published.'" Page 304. The epigrammatic language in the dissenting opinion in the *Craig* case quoted in the footnote to the *Bridges* case, as well as other striking language in the same dissenting opinion, was used with respect to a substantially different situation from the situation in the present cases with relation both to the nature of the alleged contumacious acts and to the degree of remoteness of these acts to a future decision. The statement in the dissenting opinion in the *Bridges* case, that when "a case is pending . . . is to be determined by the substantial realities of the specific situation," is particularly applicable to the present cases. A similar thought was expressed, though not directed specifically to the matter of pendency, in *Globe Newspaper Co.* v. *Commonwealth*, 188 Mass. 449, 450, where it was said that, in "some cases, the difference in the degree of detriment that would be expected to result might be sufficient to constitute a contempt if the publication were just before the trial, when the same publication, a long time before the trial, would affect the case so little as not to deserve punishment." Moreover, even the language in the dissenting opinion in the *Craig* case with respect to pendency relied on by the petitioners expressly relates only to "this

kind of contempt," that is, the kind of contempt there under consideration, a contempt by publication, and states only one of the reasons for the conclusion reached in that opinion.

It may well be that the decision in the *Parke* case and the similar decision in the *Davies* case could not have been reached in this country by reason of the constitutional protection of freedom of speech and of the press which was the ground of decision in *Bridges* v. *California*, 314 U. S. 252 — a principle not involved in the present cases. But so far as the matter of pendency is concerned, the *Parke* and *Davies* cases support the proposition for which the *Parke* case was relied upon in *Globe Newspaper Co.* v. *Commonwealth*, 188 Mass. 449, 450, that, though the case to which the contumacious acts relate must be pending at the time those acts were performed, the power to punish for contempt arises at an early stage in the case. These cases support the proposition, as applied to the facts in the present cases, that the case against Alfred A. Berlandi was pending in the Municipal Court for the purpose of punishment for contempt of an attempt to influence improperly the Chief Justice of that court with respect to the disposition of that case in that court although that case had been appealed to the Superior Court, such appeal had not been withdrawn from the Superior Court and, unless it was withdrawn, the Municipal Court had no power to act with respect to the disposition of the case.

Considering the matter of pendency in the light of "the substantial realities of the specific situation" (*Bridges* v. *California*, 314 U. S. 252, 303–304), the case against Alfred A. Berlandi was pending in the Municipal Court at the time the acts in question for which the petitioners were convicted for contempt were performed. An attempt to influence improperly the Chief Justice of that court with respect to the disposition in that court of the case against Alfred A. Berlandi, if it was to be made, might not unnaturally be made at a time when there remained the alternative of leaving the case in the Superior Court for disposition there if the attempt to exercise such improper influence in the Municipal Court with respect to the disposition of the case in that court seemed likely to be unsuccessful. On the facts alleged and

found, the withdrawal of the appeal was an essential element of the conspiracy to obtain a particular determination of the case, and such withdrawal was wholly in the control of one of the conspirators. This specific situation does not naturally fall within the broad generalization in the dissenting opinion in the *Craig* case that it "is not enough that somebody may hereafter move to have something done." It was not too early to "poison the fountain of justice" with respect to the disposition of the case against Alfred A. Berlandi in the Municipal Court.

Moreover, considering the matter somewhat more technically, the case against Alfred A. Berlandi was pending in the Municipal Court at the time the acts in question for which the petitioners were convicted for contempt were performed. There then remained in the Municipal Court not merely a general jurisdiction of the subject matter of such case but a specific jurisdiction of the particular case against Alfred A. Berlandi that had been brought in that court — a jurisdiction in a sense concurrent with that of the Superior Court — that could be invoked as of right by Alfred A. Berlandi. And the attempt to influence the Municipal Court improperly with respect to the disposition of the case was made in anticipation of the invocation of such jurisdiction if the attempt at such improper influence seemed likely to accomplish the result sought with respect to the disposition of the case. The specific case was then "pending" in the Municipal Court for the purpose of withdrawal of the appeal as a preliminary step toward final disposition of the case in that court. The case against Alfred A. Berlandi would not become a new case in that court by the withdrawal of the appeal, though such withdrawal would give that court additional jurisdiction to deal with the case, but rather continued to be the original case against him, whether or not the appeal was withdrawn, though pending in that court for a limited purpose only. An attempt to exercise improper influence upon the disposition of the case in the Municipal Court if the appeal should be withdrawn, even if it had not actually been withdrawn, might interfere with or obstruct the administration of justice.

None of the cases decided in the State courts that are relied on by the petitioners or that have come to our attention deals with a situation such as is presented in these cases. In cases dealing with situations more or less remotely analogous to the situation in the present cases differing decisions have been made. These cases need not be discussed in detail. They do not lead us to the conclusion that the criminal case against Alfred A. Berlandi was not pending in the Municipal Court for the purpose of punishing for contempt of that court an attempt to influence improperly the disposition of the case in that court upon withdrawal of the appeal to the Superior Court merely because such appeal had not actually been withdrawn so as to give the Municipal Court jurisdiction to dispose of the case.

2. The contention of the petitioners that the Municipal Court lacked jurisdiction to convict the petitioners is based, in part, on the contention that "District Courts [a term that, in general, in the absence of statutory provisions applicable only to particular courts, and in the present cases, includes the Municipal Court of the City of Boston, G. L. (Ter. Ed.) c. 218, § 1, *Long* v. *George*, 290 Mass. 316, 319] have no jurisdiction to try conspiracies." The single justice rightly ruled against this contention.

The complaint for contempt against each of the present petitioners charged that the petitioner and other persons conspired "to impede and obstruct the due administration of justice by knowingly making false and fraudulent statements and misrepresentations of alleged facts pertinent and material to the issues . . . [in the criminal case against Alfred A. Berlandi] with intent wilfully, wrongfully, fraudulently and illegally to affect and influence the opinion, judgment, decision and action of the presiding justice, F. Delano Putnam, Chief Justice of the Boston Municipal Court and/or whatsoever justice of said Court should preside at the trial of said complaint . . . and to effect the release and the discharge of the said Alfred A. Berlandi" in that case; that the petitioner Walkins, in pursuance of such conspiracy, on or about March 19, 1940, "did knowingly make to the said Court . . . false and fraudulent statements and misrepre-

sentations of alleged facts pertinent and material to the issues." in the criminal case against Alfred A. Berlandi with a like intent; and that the petitioner and other persons "did attempt to affect and influence the opinion, judgment, decision and action of the presiding justice, F. Delano Putnam, Chief Justice of the Boston Municipal Court and/or whatsoever justice of said Court should preside at the trial of said complaint against said Berlandi . . . with intent to impede and obstruct the due administration of justice as aforesaid in order to effect the release and discharge of said Alfred A. Berlandi."

The Chief Justice of the Municipal Court in his decision found as facts, as hereinbefore set forth in more detail, that on Tuesday, March 19, 1940, the petitioner Walkins asked him to allow Alfred A. Berlandi to withdraw his appeal and to revoke the finding of guilty; that "what Walkins did on Tuesday morning, as described in this decision, was done by him after Angelo [Berlandi] had been in touch with him, and at . . . [Angelo Berlandi's] request, and was done solely for the purpose of doing a favor for Angelo [Berlandi] . . . at the possible expense of the orderly administration of justice (to which Walkins was indifferent) and with possible future benefit to himself by way of reciprocal favors from Angelo [Berlandi] . . . that the defendants [meaning the four persons charged with contempt, including these two petitioners] conspired and attempted to obstruct and impede the administration of justice in this court by trying to secure, through action on my part, the freedom of the defendant Alfred A. Berlandi, a guilty man and known to them to be guilty, in the manner hereinabove described [in the decision], and that they are guilty of contempt."

We need not consider whether a conspiracy by itself independent of other facts constitutes a punishable contempt. This was not the situation in the present cases with respect either to the charges in the complaint or to the facts found. Each complaint is to be considered as a whole charging a single contempt committed by the defendant, petitioner here, through a course of conduct pursued by him of which each element, including conspiracy, was an integral part of the

alleged contempt.  *Dolan* v. *Commonwealth,* 304 Mass. 325, 338.  See also *Blankenburg* v. *Commonwealth,* 272 Mass. 25, 35.  Each complaint charged not only a conspiracy between the defendant and others to "impede and obstruct the due administration of justice" but also an attempt to do so.  And each complaint charged also specific action by the defendant Walkins, petitioner here, directed to that end.  The Chief Justice found as a fact that there was such a conspiracy, such an attempt on the part of each of the present petitioners and such specific action on the part of the petitioner Walkins, and also found as a fact, in substance, that the petitioner Walkins in taking such specific action was the agent of the petitioner Berlandi.  Conspiracy when charged and found could rightly be treated as an element of the contempt. *Blankenburg* v. *Commonwealth,* 272 Mass. 25, 35.  *Dolan* v. *Commonwealth,* 304 Mass. 325, 338, 339.

Even if the conspiracy found was punishable as a criminal offence, the Municipal Court was not for that reason precluded from punishing as contempt a course of conduct of which such conspiracy was a part.  "The 'jurisdiction and power of the court [to punish for contempt] do not depend upon the question whether the offence might or might not be punished by indictment.'  *Cartwright's Case,* 114 Mass. 230, 239.  'Punishment, purely as such, through contempt proceedings, legislative or judicial, is not precluded because punishment may also be inflicted for the same act as a statutory offense.'  *Jurney* v. *MacCracken,* 294 U. S. 125, 151."  *Dolan* v. *Commonwealth,* 304 Mass. 325, 344.  And the fact that District Courts, including the Municipal Court of the City of Boston, have no jurisdiction to punish conspiracies as criminal offences (G. L. [Ter. Ed.] c. 218, § 26, as appearing in St. 1938, c. 365, § 1) does not prevent such courts having jurisdiction to punish as contempts conduct of which conspiracy is an element.  The decision in *Dolan* v. *Commonwealth,* 304 Mass. 325, did not rest upon the fact stated in the opinion that the conduct for which the petitioner in that case was convicted of contempt in the Superior Court also constituted "a crime prosecution for which is within the jurisdiction of the Superior

Court." Page 344. The "District Courts of this Commonwealth are 'courts of superior and general jurisdiction' in matters of contempt, G. L. (Ter. Ed.) c. 218, § 4, as in other matters within their jurisdiction." *Silverton* v. *Commonwealth, ante,* 52, 54. The jurisdiction of such courts to punish for contempt does not rest upon statutory grounds. In *Blankenburg* v. *Commonwealth,* 260 Mass. 369, 372–373, this court stated the nature of the power to punish for criminal contempt possessed by courts of record and of superior and general jurisdiction in these terms: "As such, they possess the inherent power summarily to investigate and to punish as for a public wrong those committing acts tending to obstruct or to degrade the administration of justice. Such power is essential to the performance of their functions, to the maintenance of their authority, and to their capacity to determine the rights of parties according to law. This power cannot be dispensed with in a court because it is necessary to the execution of all its other powers. It is a part of the law of the land," and added that a proceeding for criminal contempt such as was involved in that case "is in exercise of a jurisdiction with which the common law of this Commonwealth clothes all its courts." See *Opinion of the Justices, post,* 767, 776.

Second. The petitioners contend that the "court admitted improper evidence against the defendants Walkins and Berlandi, together and individually, thus committing prejudicial errors." With respect to the assignments of errors upon which this contention is based, the single justice ruled that they were not well founded in fact. In so ruling he was right. The assignments of error contain allegations as to the admission of evidence at the trial of the complaints for contempt before the Chief Justice of the Municipal Court. But the alleged facts relating to the admission of evidence set forth in these assignments are not stated in the decision of the Chief Justice that is incorporated in the returns. Such facts would appear only in a report of the evidence "heard at the trial on the merits" and such evidence "is no part of the record and hence cannot be considered on a writ of error." *Blankenburg* v. *Commonwealth,*

260 Mass. 369, 377.  *Dolan* v. *Commonwealth*, 304 Mass.
325, 331, 342.  See also *Blankenburg* v. *Commonwealth*, 272
Mass. 25, 33.  Moreover, the pleas in nullo est erratum
filed by the Commonwealth, which admit only facts well
pleaded, do not admit facts alleged in the assignments of
error with respect to the admission of evidence at the trial.
These are not the kind of errors of fact that can be assigned
in a petition for a writ of error.  An "error of fact" in a
judgment that by the terms of G. L. (Ter. Ed.) c. 250, § 9,
may be reviewed upon a writ of error "does not refer to
errors as to findings of fact made at a trial" but refers to
"matters of fact not heard and decided at the trial under
review."  *Blankenburg* v. *Commonwealth*, 260 Mass. 369,
376–377.  *Dolan* v. *Commonwealth*, 304 Mass. 325, 332.
*Silverton* v. *Commonwealth, ante,* 52, 53.

Third.  The petitioners contend that the "Chief Justice
[of the Municipal Court] united in himself the double
capacity of judge and witness and refused to submit to
cross-examination in violation of law, and State and Fed-
eral Constitutions."  So far as this contention was pre-
sented by the assignments of error, the single justice ruled
against it.  In so ruling there was no error.

The cases for criminal contempt, as appears from the
record, were tried by the judge, the Chief Justice of the
Municipal Court, whose decision in a criminal case, accord-
ing to the charges in the complaints and findings, the peti-
tioners conspired and attempted to influence improperly.
In the decision of the Chief Justice in the contempt cases,
incorporated in the returns, the following statements are
made: "41. The defendant Walkins filed a motion asking
that I disqualify myself for hearing his case on the ground
that I was a witness to matters which happened before me,
on which there was said to be a substantial controversy of
fact, and that in me was united 'the double capacity of
judge and witness in the same trial.'  Counsel for Angelo
V. Berlandi asked, in substance, that it be considered by
me that he presented a similar motion on behalf of his
client without one actually being filed, and I consented to
that procedure.  After hearing counsel I denied said mo-

tions.   42. The defendant Walkins filed a paper in which he objected that he, in violation of Part First, Article XII of the Constitution of Massachusetts, was not confronted with all the witnesses against him face to face 'but the principal witness against him was the presiding judge, who in connection with his (the judge's) evidence ruled .that no questions should be asked him (the judge) regarding his evidence as a witness.'   This paper also contains a substantially similar objection based on the 'due process of law' clause of Section 1 of Article XIV of the amendments to the Constitution of the United States.   It was agreed by me, at the request of counsel, that a similar paper, containing similar objections, might be deemed to have been filed on behalf of Angelo Berlandi.   43. The facts on which these objections are based are set forth in paragraph 28 of this decision.   Counsel stated that these objections did not call for any action on my part and that they were simply being put on record by counsel for the purpose of raising certain constitutional questions.   So far as they do call for any action on my part I rule that they are not well taken."

Paragraph 27, immediately preceding paragraph 28 referred to in paragraph 43, and said paragraph 28 are as follows: "27. Sometime . . . on the forenoon of Tuesday, March 19, Walkins came into the first criminal session of the Municipal Court while I was sitting on the bench.   He would have me believe that he did not then know the strength of the Commonwealth's case against Freddy.   I do not so believe.   I find that he had every reason to believe, and did then believe, that Freddy was guilty.   28. He secured my attention during some interval between trials and represented to me that another man had confessed to the larceny of which I had found Freddy guilty on the day before and asked me to allow Freddy to withdraw his appeal and to revoke my finding of guilty.   This he himself admits having done.   He then said something further to me.   He testified that what he said further was to ask me to continue Freddy's case so that it might be tried with the case of the other man who had confessed. My own recollection of what he further asked me was that

he wanted me to dismiss the case against Freddy. This recollection of mine was stated by me in open court, at the close of the Commonwealth's evidence in these contempt cases, and when I stated it I stated that I was not to be subject to cross-examination. Some weeks before these trials started counsel for Angelo and Walkins had asked me, in chambers, to tell them my personal recollection on this point and I then told them, in substance, that any statement I should make would be made in open court, and that I expected to make such a statement. Before making the above statement in open court as to my personal recollection on this point I was careful to state that anything I had to say should be considered by me as only one piece of evidence to be considered, and weighed, along with all the other evidence in the case, and that it was, of course, open to any party to contradict it and to argue its weight and credibility under the circumstances."

Whatever may have been the nature of the contempts charged, whether direct or, on the other hand, indirect or constructive, the cases were tried in accordance with the procedure applicable to indirect or constructive contempts in that the accused was advised of the charges and had a reasonable opportunity to meet them by way of defence or explanation. *Dolan* v. *Commonwealth*, 304 Mass. 325, 337. This was the procedure followed, properly though not necessarily, in the *Blankenburg* case, although the contempt there involved is described as a direct contempt. *Blankenburg* v. *Commonwealth*, 272 Mass. 25, 28, 34, 36. See also *Blankenburg* v. *Commonwealth*, 260 Mass. 369.

The Chief Justice committed no legal error in declining to declare himself disqualified to hear the contempt cases and in proceeding to hear them. Doubtless it would have been permissible practice for him to decline to hear these cases and to refer them to another judge for hearing (see *Cooke* v. *United States*, 267 U. S. 517, 539), but it has been said by this court in *Blankenburg* v. *Commonwealth*, 272 Mass. 25, 38, that the "fundamental conception of contempt of court is that the judge, in whose presence it occurs, is best fitted to pass upon it, save in exceptional cases," and practi-

cal considerations were stated why the hearing in that case should not be transferred to another judge. The court was there dealing with a contempt that it described as "direct" as "committed in the very presence of the court," and held that a summary arrest was warranted, that "no warrant was necessary" (page 34), and that the "conspiracy which formed a part of the contempt was operative up to the moment of arrest. The conduct of the plaintiff in error constituted a course of action of which each element was an integral part." Page 35. With respect to certain specifications filed after the arrest, the court said: "The specifications, although detailing certain matters not occurring in the actual presence of the court, in effect related to a single scheme having its fruition in what occurred in the presence of the trial judge. It already has been pointed out that the arrest of the plaintiff in error for direct contempt was legal. Even if it be assumed that certain specifications related to matters susceptible of being treated as indirect contempt, every requirement for procedure in cases of indirect contempt was thereafter followed, viz., specifications, notice, time for defence, and full hearing with aid of counsel." Page 37. Even if the contempts in question in the present cases are properly to be described as indirect or constructive rather than direct, the principles stated in the *Blankenburg* case — apart from the matter of arrest which is not here involved — are applicable. An integral part of these contempts was the representations made by the petitioner Walkins to the Chief Justice while he "was sitting on the bench" in "the first criminal session of the Municipal Court" "during some interval between trials" as set forth in paragraphs 27 and 28 of the decision of the Chief Justice. These elements of the contempts occurred "directly under the eye or within the view of the court" (*Savin, petitioner*, 131 U. S. 267, 277; *Cooke* v. *United States*, 267 U. S. 517, 535), that is, of the Chief Justice while he was conducting a session of the court. With respect to these direct elements of the contempts the Chief Justice was in a position similar to that of a judge in the case of a contempt in all respects direct. So far as the indirect elements of the contempts here in question are concerned,

they do not furnish the same practical considerations for a hearing of the contempt cases by the judge in whose presence the direct elements of the contempts occurred, but the indirect elements did not disqualify him from hearing the cases. See *Blankenburg* v. *Commonwealth*, 272 Mass. 25, 37. Indeed, the present contention of the petitioners is not directed to the indirect elements. It is directed to the direct elements of the contempts of which the Chief Justice had personal knowledge.

The present contention of the petitioners is that with respect to the direct elements of the contempts the "Chief Justice united in himself the double capacity of judge and witness and refused to submit to cross-examination." Apart, at least, from the matter of the "view" hereinafter considered, it is not argued that the Chief Justice acted in this dual capacity with respect to any elements of the contempts other than the direct elements of the contempts described in the decision that occurred in his presence when he was "sitting on the bench" in "the first criminal session" of the court. A contention somewhat similar to that here made was made in *Blankenburg* v. *Commonwealth*, 272 Mass. 25, where, though the contempt involved was described as direct, the procedure — apart from an arrest without a warrant — applicable to an indirect contempt was followed, and the court held that the conviction was not vitiated by error even though "certain specifications related to matters susceptible of being treated as indirect contempt." Page 37. The court said: "The plaintiff in error complains that the trial judge relied upon his judicial memory of what had occurred and that this was not specifically called to her attention. There is no merit in this. Proceedings for contempt are sui generis not hedged about with provisions to be observed in prosecutions for crime under complaints or indictments. Where, as here, the contempt was direct and in the presence of the court, the trial judge rightly may act upon his judicial knowledge of facts constituting contempt." Page 36. See also *Ex parte Terry*, 128 U. S. 289, 309; *Bowles* v. *United States*, 50 Fed. (2d) 848, 852; certiorari denied, 284 U. S. 648. This principle seems to us applicable to the direct ele-

ments within the judicial knowledge of the judge in the course of conduct of the petitioners in the present cases, even though such course of conduct as a whole constituted an indirect or constructive contempt and contained elements that were not within the judicial knowledge of the judge. According to the principle stated in the *Blankenburg* case, the Chief Justice, so far as he relied upon his judicial knowledge of the facts constituting the direct elements of the contempts, was not acting in a dual capacity as judge and witness. In so relying he would have been acting as a judge exercising a judicial function and not as a witness subject to the ordinary rules applicable to a witness. Upon this broad ground the present contention of the petitioners fails.

But even apart from this broad ground there are narrower grounds by reason of which the present contention of the petitioners cannot be sustained. The burden was imposed upon the petitioners of showing error in the judgments convicting them of contempt. *Harding* v. *Commonwealth*, 283 Mass. 369, 371. The record, however, does not show, except in one particular, the extent, if at all, that the Chief Justice, in making his findings with respect to the direct elements of the contempts, relied upon his judicial knowledge of the facts bearing upon these direct elements. These findings, doubtless, are of such a nature that it is not improbable that he so relied, but there may have been evidence, apart from his judicial knowledge, sufficient to support the findings. Moreover, the record does not show that, except in one particular, the Chief Justice made any statement at the hearing of his personal knowledge of the facts bearing upon the direct elements in the contempts.

So far as the record shows, the only statement made by the Chief Justice in open court of his understanding of the facts — a statement with respect to which he stated that he was not to be subject to cross-examination — was a statement of his recollection as to what the petitioner Walkins requested at the time this petitioner made representations to him with respect to the criminal case against Alfred A. Berlandi. The Chief Justice states that his "own recollection of what . . . [the petitioner Walkins] asked me was

that he wanted me to dismiss the case against Freddy,"
Alfred A. Berlandi, but that this petitioner testified "that
what he said further was to ask me to continue Freddy's
case so that it might be tried with the case of the other man
who had confessed."  The Chief Justice stated in his deci-
sion that in "the view which I take of these cases it makes no
difference just what his final request to me was, — whether
for a continuance, and a new trial or for a dismissal.  Either
request was, under the circumstances disclosed by the evi-
dence and outlined in this decision, wholly improper, and
tended to obstruct justice."  The single justice ruled rightly
that, even if the rule in the *Blankenburg* case was inappli-
cable, which he did not intimate, "the petitioners have not
been harmed, for the only fact in the statement of the Chief
Justice the truth of which was challenged by the petitioners
was that Walkins asked the Chief Justice not merely to re-
voke the finding of guilty against Alfred A. Berlandi, but
also to dismiss the case against him.  As the Chief Justice
rightly held, a request to dismiss the case was not essential
to his finding that the petitioners were guilty of contempt.
The conversation in the form for which the petitioners con-
tended was sufficient foundation for his finding.  If the
Chief Justice erred, his error was harmless."  The sufficiency
of the conversation in the form for which the petitioners
contended as a foundation for the finding of the Chief Jus-
tice that they were guilty of contempt is considered later
in this opinion.  It cannot be said upon this record that the
convictions were not rested upon the conversation in this
form.

Fourth.  The petitioners contend that the "action of the
Chief Justice after the close of the evidence and after argu-
ment of counsel, but before decision, in taking a view of
premises mentioned in the evidence in the presence of Lieu-
tenant Hoban, a witness for the Commonwealth at the
trial, without the consent, knowledge, or presence of the
defendants or their counsel, was error."

The facts upon which this contention is based are stated
in extensions of the returns as follows:  "As appears from
my decision rendered in these cases, and incorporated in

the extended record heretofore returned by me, much transpired in Police Station 1. There was much testimony given at the trial as to the comings and goings of various people at that station, with talk of 'upstairs' and 'downstairs' and the cellroom. I had no personal knowledge of the physical lay-out of that station. Before completing my said written decision I deemed it desirable to see the place, — not absolutely necessary but desirable. There had been evidence that certain of the defendants had been locked up in two cells numbered, if I remember correctly, eight and fourteen. I thought it would be well to have a look at those cells, and I was shown them by the officer in charge who happened at that time to be Lieutenant Hoban. He also, at my request, took me up to the second floor of the building and I looked at it. I also saw the front steps of the station, about which there had been some testimony. I had no talk with Lieutenant Hoban or any other person other than the merest formalities. The whole visit lasted not over four or five minutes. I learned little of value by it and what I saw did not in any way affect my decision. It merely helped somewhat to elucidate certain rather vague testimony as to the movements of certain parties and witnesses in and near the station."

The single justice ruled that the "Chief Justice was in error in taking a view unknown to the parties or counsel," but that "it is unlikely that any information obtained on the view had any real influence upon the decision. Nothing very vital happened at the police station. The Chief Justice gives assurance that what he saw 'did not in any way affect my [his] decision.' There is no reason to doubt either his intention to state the fact truly or the accuracy of his mental operations. The error appears to be harmless."

The ruling of the single justice, in effect, that there was no prejudicial error, was right.

"The power to inform itself by a view . . . is inherent in a court at common law." *Madden* v. *Boston Elevated Railway*, 284 Mass. 490, 493–494. "There is no valid objection to a judge taking such a view upon his own motion

. . . if he notifies the parties that he proposes to take such view and deems it would be of assistance to understand better the testimony which has been or may be presented. It is a matter resting within the judicial discretion of the trial judge." *Sargeant* v. *Traverse Building Trust*, 267 Mass. 490, 495. This principle is applicable even to a criminal case although in such a case the view is ordinarily taken by the jury, the usual trier of fact in such a case. *Commonwealth* v. *Dascalakis*, 246 Mass. 12, 30–31. A fortiori, it is applicable to a contempt case.

Doubtless the taking of the view in the circumstances described in the returns was objectionable practice. But the statement of the Chief Justice that "what I saw did not in any way affect my decision" is to be given full credence. Nothing in the returns tends to cast doubt upon this statement. And in the light of this statement there was no prejudicial error.

A view is not technically evidence and subject to all the principles applicable to evidence in the technical sense. Thus a view may be taken in a criminal case in the absence of the defendant without violation of the constitutional principle that he is entitled to "meet the witnesses against him face to face." Constitution of Massachusetts, Declaration of Rights, art. 12. *Commonwealth* v. *Dascalakis*, 246 Mass. 12, 31. *Commonwealth* v. *Belenski*, 276 Mass. 35, 40. *Commonwealth* v. *Snyder*, 282 Mass. 401, 412–414, affirmed sub nomine *Snyder* v. *Massachusetts*, 291 U. S. 97. However, though a view is not evidence in the technical sense, it has been said that it inevitably has the effect of evidence (*Commonwealth* v. *Dascalakis*, 246 Mass. 12, 29; *Snyder* v. *Massachusetts*, 291 U. S. 97, 121), and information properly acquired upon a view "may properly be treated as evidence in the case." *Keeney* v. *Ciborowski*, 304 Mass. 371, 372. See *Commonwealth* v. *Handren*, 261 Mass. 294, 297. Nevertheless, a "judge presiding at a trial properly may rule upon the effect of the evidence and order a verdict although the jury have taken a view, if it does not appear that the jury could have acquired from the view the knowledge of any material facts which were not put in evidence in court."

*McMahon* v. *Lynn & Boston Railroad,* 191 Mass. 295, 299. *Keeney* v. *Ciborowski,* 304 Mass. 371, 373. Information acquired upon a view, however, at most stands no higher than evidence and is subject to like principles with respect to its prejudicial effect.

The admission of incompetent evidence at a trial before a judge or a jury does not vitiate a finding or verdict if the party against whom the finding or verdict is rendered suffers no harm from such admission of evidence. This principle, in substance, has been applied to an unauthorized view taken by a juror (*Commonwealth* v. *Desmond,* 141 Mass. 200, 202–203; *Collins* v. *Splane,* 230 Mass. 281, 287; compare *Harrington* v. *Worcester, Leicester & Spencer Street Railway,* 157 Mass. 579, 582–583) and to an occurrence at a view that was outside the proper scope of a view. *Snyder* v. *Massachusetts,* 291 U. S. 97, 118. See also *State* v. *Crouch,* 130 Iowa, 478, 485–486. The admission of incompetent evidence at a trial before a jury does not vitiate the verdict "if before the case is given to the jury they are instructed to disregard it, and if there is no reason to apprehend that it finally did prejudice their minds. It will be presumed that they followed the instructions given to them and did not allow their minds to be affected by the evidence which had been withdrawn from their consideration." *Allen* v. *Boston Elevated Railway,* 212 Mass. 191, 194, and cases cited. *Stricker* v. *Scott,* 283 Mass. 12, 14. This principle, in substance, was applied in *Commonwealth* v. *Madeiros,* 255 Mass. 304, 313, to an occurrence at a view. The jury were instructed to disregard the occurrence, and it was held that, by reason of this instruction, the defendant suffered no harm. The principle has been applied in a somewhat different form to hearings before judges sitting without juries where there were statements by the judge that he was "unaffected" by evidence or did not consider it. *Newman* v. *Newman,* 211 Mass. 508, 509–510. *Manning* v. *Woodlawn Cemetery Corp.* 245 Mass. 250, 252–253. See also *O'Brien* v. *Keefe,* 175 Mass. 274, 277–278, 280–282; *Jameson* v. *Hayes,* 250 Mass. 302, 308–309; *Nicoli* v. *Berglund,* 293 Mass. 426, 430–431; *Chopelas* v. *Chopelas,*

303 Mass. 33, 35. Clearly statements to this effect by
a judge are entitled to as great weight as the presump-
tion that a jury follows instructions to disregard evidence.
This principle applicable to evidence improperly admitted
is equally applicable to information acquired at a view
improperly taken.   The statement of the Chief Justice
falls within the principle, with the result that the petitioners
were not harmed by the view.   See *State* v. *Crouch,* 130
Iowa, 478, 485–486.

The petitioners particularly rely upon *Webster* v. *Pull-
man Co.* 51 Ohio App. 131, and *Regina* v. *Petrie,* 20 Ont.
317.   The facts in the former case differ materially from
those in the present cases.   In the latter case there was an
intimation that the judge was not authorized to take a
view in any circumstances.   So far, however, as these cases
are not distinguishable from the present cases, they are
not to be followed in view of the principles established by
our decisions as herein stated.

Fifth.   The petitioners contend that the "defendants
Walkins and Berlandi were not tried by a fair and impar-
tial judge."   In ruling against this contention so far as it
was presented by the assignments of error the single justice
was right.

The fact that the Chief Justice of the Municipal Court,
who heard the cases, was the judge whom, as charged by
the complaints, the petitioners attempted and conspired to
influence improperly, did not disqualify him from hearing
the cases or render him lacking in the impartiality essen-
tial to a judge hearing these cases.   The propriety of his
hearing the cases has already been considered.   But it is
to be added that the contempts set forth were in no sense
personal to the judge.   In a proceeding for contempt the
"court is not a party.   There is nothing that affects the
judges in their own persons.   Their concern is only that
the law should be obeyed and enforced, and their interest is
no other than that they represent in every case."   *United
States* v. *Shipp,* 203 U. S. 563, 574, quoted in *Blankenburg*
v. *Commonwealth,* 272 Mass. 25, 37.   And the fact that the
Chief Justice had judicial knowledge of the elements of the

contempts that occurred in his presence, and, as already pointed out, was entitled to use such judicial knowledge in deciding the cases, did not render him lacking in impartiality. On the contrary, the possession of such judicial knowledge rendered it fitting that he and not some other judge should hear the cases. *Blankenburg* v. *Commonwealth*, 272 Mass. 25, 37–38. Furthermore, the record shows no bias or prejudice on the part of the Chief Justice against the petitioners. The manner in which he conducted the cases, as disclosed by the record including the full findings of fact embodied in his decision, furnishes no ground for the conclusion that he was biased or prejudiced against the petitioners or that for any other reason he was incapable of giving them an impartial trial or did not do so. No such conclusion is to be drawn from the circumstances in which he took the view or from his statement with respect thereto that "what I saw did not in any way affect my decision."

Sixth. The petitioners contend that the "evidence did not warrant a finding of guilty."

In the form in which this contention is stated it cannot be sustained for evidence "heard at the trial on the merits is no part of the record and hence cannot be considered on a writ of error." *Blankenburg* v. *Commonwealth*, 260 Mass. 369, 377. *Dolan* v. *Commonwealth*, 304 Mass. 325, 331.

But even if this contention is construed as a contention that the facts found by the Chief Justice do not constitute contempt of court on the part of either of the petitioners, and it is assumed that the assignments of error present this question, the contention cannot be sustained.

The ultimate finding of the Chief Justice was that "the defendants [meaning the four persons charged with contempt, including these two petitioners] conspired and attempted to obstruct and impede the administration of justice in this court by trying to secure, through action on my part, the freedom of the defendant Alfred A. Berlandi, a guilty man and known to them to be guilty, in the manner hereinabove described [in the decision], and that they are guilty of contempt. The fact that their said conspiracy

and attempt to secure said freedom was unsuccessful makes no difference."

The contempts of which each of the petitioners and others were found guilty constituted a single contempt, in which each of the petitioners participated, committed by them through a course of conduct of which each element was an integral part of the contempt. And conspiracy was a part of the contempt (*Dolan* v. *Commonwealth*, 304 Mass. 325, 338; see *Blankenburg* v. *Commonwealth*, 272 Mass. 25, 35), a conspiracy that was operative up to and including the time of the overt act of the petitioner Walkins. *Blankenburg* v. *Commonwealth*, 272 Mass. 25, 35. The petitioner Berlandi is not relieved from liability for this contempt merely because he did not participate directly with the petitioner Walkins in the overt act in which the conspiracy culminated. Furthermore, the fact that the conspiracy and attempt of which each of the petitioners was found guilty were not successful did not prevent such conspiracy and attempt from constituting a contempt. *Hurley* v. *Commonwealth*, 188 Mass. 443, 447. *Dolan* v. *Commonwealth*, 304 Mass. 325, 342.

The petitioners, however, contend that the overt act of the petitioner Walkins was innocuous, that it did not obstruct justice and consequently did not constitute a contempt. It must be taken on this record that this overt act was a request made on Tuesday forenoon, March 19, 1940, by the petitioner Walkins of the Chief Justice, who on the day before had found Alfred A. Berlandi guilty of larceny, to allow Alfred A. Berlandi to withdraw his appeal to the Superior Court, to revoke the finding of guilty and to continue the case against Alfred A. Berlandi "so that it might be tried with the case of the other man who had confessed." The Chief Justice "declined to do anything about reopening . . . [Alfred A. Berlandi's] case and Walkins went away."

An essential element of a contempt, expressed in various ways, is that the acts done have a "direct tendency to obstruct the administration of justice in a court" (*Globe Newspaper Co.* v. *Commonwealth*, 188 Mass. 449, 453), that they constitute an "obstruction to the court in the performance

of its duty," though the "reasonable tendency of the acts done is the test whether they constitute contempt of court" (*Blankenburg* v. *Commonwealth,* 272 Mass. 25, 33), that the acts "have a tendency to interfere with the course of justice," although the "criterion is not the influence upon the minds of particular persons but the reasonable tendency of the acts done to bring about a pernicious result." *Woodbury* v. *Commonwealth,* 295 Mass. 316, 321. See also *Hurley* v. *Commonwealth,* 188 Mass. 443, 447, where the attempt to influence jurors improperly, for which there was a conviction for contempt, never came to the attention of the jurors. The question on this aspect of the case, therefore, is whether the act of the petitioner Walkins in which the alleged contempt culminated had a reasonable tendency to interfere with or obstruct the course of justice rather than whether it constituted such an actual interference or obstruction. But an attempt to influence improperly a judge in the determination of a case pending before him constitutes a contempt (*Telegram Newspaper Co.* v. *Commonwealth,* 172 Mass. 294, 300), and such an attempt, where the judge is actually approached for the purpose of influencing him improperly, might perhaps fairly be described as an actual interference or obstruction rather than merely as having such a tendency, even though it was unsuccessful. The distinction is little more than verbal. Such an attempt might actually constitute an interference with the "capacity [of the court] to determine the rights of parties according to law" (*Blankenburg* v. *Commonwealth,* 260 Mass. 369, 373), though the judge did not yield to the improper influence. It is in the interest of the public and of parties engaged in litigation that a judge, even though high-minded and capable of wise discrimination, shall not be subjected to any improper influence by which he may be affected, even unconsciously, in deciding a case. And a person is not excused from attempting to influence a judge improperly by reason of the high character of the particular judge and the improbability that he will be influenced by the attempt. See *Woodbury* v. *Commonwealth,* 295 Mass. 316, 321.

On the facts found, the petitioners with others conspired

and attempted to influence improperly the decision of the Chief Justice with respect to the criminal case against Alfred A. Berlandi. The petitioners seek to bring the request made by the petitioner Walkins of the Chief Justice within the principle stated in *Commonwealth* v. *McParland*, 148 Mass. 127, 129, that there "is no law . . . to prevent a man's friends combining to help him by honest means to an acquittal from a false charge." But the present cases do not fall within this principle.

The request made by the petitioner Walkins must be considered in its setting as one element in a single course of conduct. The request was accompanied by a representation by this petitioner to the Chief Justice that another person had confessed to the larceny of which the Chief Justice had found Alfred A. Berlandi guilty. This was true. But this confession was brought about as a part of a scheme in which the petitioner Berlandi participated by which the freedom of Alfred A. Berlandi was to be secured and the person who had confessed was to be tried for the crime. The Chief Justice found as to some of the steps in this scheme that "a 'take-the-rap' matter was in progress." There are no findings as to the precise extent of the knowledge of this scheme possessed by the petitioner Walkins, but at some time before he made the request of the Chief Justice on Tuesday, March 19, 1940, he became interested and active in the matter of the criminal case against Alfred A. Berlandi. The Chief Justice found that "there was no occasion whatever, in the ordinary conduct of the police business, for Walkins . . . to inject himself into the situation in any way," and that "what Walkins did on Tuesday morning . . . was done by him after Angelo [Berlandi] had been in touch with him, and at . . . [Angelo Berlandi's] request, and was done solely for the purpose of doing a favor for Angelo [Berlandi] . . . at the possible expense of the orderly administration of justice." In these circumstances the petitioner Walkins made the request of the Chief Justice to revoke the finding of guilty against Alfred A. Berlandi and to continue the case for trial with the case of the person who had confessed, not only representing that this person had confessed but also

impliedly representing that the petitioner did not know the strength of the Commonwealth's case against Alfred A. Berlandi. The Chief Justice, however, found that this implied representation was not true and, moreover, found that the petitioner Walkins "had every reason to believe, and did then believe, that . . . [Alfred A. Berlandi] was guilty."

The findings show that the petitioner Walkins was knowingly attempting to carry out "a 'take-the-rap' matter" by securing a reversal of the conviction of Alfred A. Berlandi, whom he believed to be guilty, and a new trial for said Alfred A. Berlandi with the person who had confessed the crime. It might properly be inferred that he acted with the reasonable expectation that the result of such a trial would be that the person who had confessed would take the blame for the crime and Alfred A. Berlandi would secure his freedom. The method of accomplishing this object involved an implied misrepresentation by the petitioner Walkins to the Chief Justice as to this petitioner's belief in the strength of the Commonwealth's case against Alfred A. Berlandi. Such conduct on the part of this petitioner, in combination with the conduct of the petitioner Berlandi and that of others, was far from a combination such as is described in *Commonwealth* v. *McParland,* 148 Mass. 127, 129, as a combination "to help him [here Alfred A. Berlandi] by honest means to an acquittal from a false charge." Whatever may be true of an attempt by means other than those here used to secure a new trial for a person believed to be guilty — and who had been found guilty — it cannot be ruled as matter of law that an attempt to obtain such a result by the method here employed did not constitute an attempt to influence improperly a judge in the disposition of a case pending before him which actually interfered with or obstructed the administration of justice, or at least had a reasonable tendency to do so, and amounted to a contempt. The situation is somewhat like an attempt to influence the decision of a court by false testimony. See *Blankenburg* v. *Commonwealth,* 272 Mass. 25, 32.

The present cases are distinguishable from *Doniphan* v. *Lehman,* 179 Fed. 173, relied on by the petitioners, where the taking of a deposition in pursuance of a conspiracy to

impose upon the court, the filing thereof and its publication after such filing, were held not to constitute a contempt within the meaning of the narrow Federal statute because not "misbehavior in or so near the presence of the court as to obstruct the administration of justice," since the deposition was neither used nor offered for use in or near the presence of the court (compare, however, *Hurley* v. *Commonwealth*, 188 Mass. 443, 447), although it was stated that doubtless, "if the deposition were used or offered for use in court, it would constitute a contempt." Page 175.

Seventh. The petitioners contend that the sentences were excessive.

This contention cannot be sustained. The petitioner Berlandi was sentenced to be confined in the common jail for the term of nine months, the petitioner Walkins to be so confined for the term of six months. Commitment to the common jail was legal. G. L. (Ter. Ed.) c. 220, § 14. Even if it be assumed that in some circumstances there might be error of law with respect to the length of time for which such commitment was made that could be reviewed on writ of error (compare *New York Central Railroad* v. *Ayer*, 253 Mass. 122, 129), no such error is shown in either of the present cases. *Dolan* v. *Commonwealth*, 304 Mass. 325, 345.

Since there was no error in the rulings of the single justice and no error is disclosed in the records of the cases in the Municipal Court of the City of Boston, the judgment of that court in each case must be affirmed.

*So ordered.*