JOSE H. CORREIA *vs.* SANDRA CORREIA.

No. 07-P-45.

Bristol. October 4, 2007. - December 11, 2007.

Present: KANTROWITZ, BROWN, & GREEN, JJ.

*Contempt. Practice, Criminal,* Contempt proceeding, Disqualification of judge.

Where a Probate and Family Court judge, sua sponte, converted a complaint for civil contempt to a charge of criminal contempt, the judge erred in then questioning the defendant; however, where the defendant's attorney did not object to the questioning, the issue was waived, and further, the defendant did not suffer any prejudice. [814-816]

This court declined to consider the adequacy of the notice that the wife in a divorce action received of a criminal contempt charge against her, where the wife did not raise the issue in the lower court. [816-817]

There was no merit to the argument that Mass.R.Crim.P. 44(c) required a Probate and Family Court judge to recuse himself from hearing a criminal contempt charge. [817]

A Probate and Family Court judge did not abuse his discretion in denying a motion to recuse himself from hearing a criminal contempt charge, where the judge consulted his own emotions and conscience and then objectively appraised whether this was a proceeding in which his impartiality might reasonably be questioned, and where the motion was filed on the morning of trial, more than four months after the hearing upon which it was based, and would have resulted in further delay of an already drawn out proceeding. [817-819]

The evidence at the trial of a criminal contempt charge proved beyond a reasonable doubt that there was a clear and unequivocal order that was in effect throughout the relevant period of time, that the defendant knew of the order, and that the defendant wilfully disobeyed that order. [820-821]

COMPLAINT for divorce filed in the Bristol Division of the Probate and Family Court Department on September 21, 2001.

A complaint for contempt, filed on November 16, 2004, was heard by *Armand Fernandes, Jr.,* J., and a motion to recuse was also heard by him.

*John J. Perenyi* for the defendant.

*Sheila M. Tierney* for the plaintiff.

KANTROWITZ, J. Jose Correia filed a complaint for civil contempt in the Bristol County Probate and Family Court (probate court) which was converted, sua sponte, to a criminal contempt.[1] The defendant, Sandra Correia, appeals the trial judge's order denying her motion to recuse and the judgment of conviction entered against her for criminal contempt.[2] Specifically, she argues (1) that the judge should have recused himself on grounds of bias[3]; and (2) insufficiency of the evidence of contempt. Although we are concerned with certain aspects of the case, we nonetheless affirm.

*Facts.* Sandra filed a complaint seeking a divorce on grounds of irretrievable breakdown in September of 2001. On October 22, 2001, the judge entered a temporary order granting her sole legal and physical custody of the couple's two young children. Following allegations by Sandra that Jose sexually assaulted the children, the judge on August 1, 2002, appointed Dr. Sarah McLeod of the Children and the Law Program at Massachusetts General Hospital as guardian ad litem to conduct a forensic evaluation on the questions of visitation and whether abuse had occurred. Dr. McLeod filed her initial report on April 3, 2003, and supplemental reports on August 22, 2003, and November 5, 2003.

Dr. McLeod wished to conduct interviews and observation of Jose and the children jointly, which Sandra opposed. More than one year after Dr. McLeod had been appointed guardian ad litem, the sexual abuse evaluations still had not been completed and no recommendations regarding visitation had been made. Dr. McLeod's November 5, 2003, report indicated that the reason for the delay was that Sandra refused to permit the children to complete the evaluation sessions.

On December 9, 2003, Sandra filed a motion for instructions, seeking an order that the guardian ad litem not follow through

---

[1]For the sake of clarity, we refer to the parties by their first names.

[2]Sandra received a 100-day jail sentence, which was suspended until May 4, 2006.

[3]Subsumed in this argument are additional claims of (a) improper notice; (b) the judge's lack of proper deference to Mass.R.Crim.P. 44(c), 378 Mass. 920 (1979); and (c) extrajudicial familiarity with the facts.

with her proposed evaluation.[4] Following a hearing on that mo-
tion, the judge issued an order on January 5, 2004, denying
Sandra's motion and ordering the parties to comply forthwith
with the evaluation proposed by Dr. McLeod. The guardian ad
litem was instructed to complete the requested evaluation and
file a report with the court within sixty days. The January 5,
2004, order also stated that while the judge found Sandra's ac-
tions up to that point "troublesome," he could not definitively
say they were taken in bad faith.

Following the court's January 5, 2004, order, Dr. McLeod
unsuccessfully attempted to schedule an interview with the chil-
dren. She called Sandra three times during the week of January
26, 2004, and once each on February 15 and 20 and March 27,
2004, leaving messages indicating when she would be in the
office. Sandra left messages for Dr. McLeod on three occasions,
in the evenings and early morning, when the doctor was not in
her office.

In February and March of 2004, Dr. McLeod wrote to Bruce
Lider, Sandra's attorney at the time, seeking assistance in contact-
ing Sandra. Despite these efforts, Dr. McLeod was unable to ar-
range an interview with the children at that time. In March of
2004, Attorney Lider filed a motion for leave to withdraw, cit-
ing a total inability to communicate with or contact his client.
The attorney's mail to Sandra's last known address was returned
and none of her known telephone numbers worked. It was later
discovered that Sandra, along with her children, had moved to
Iowa in January, 2004, to join her fiancé. Dr. McLeod finally
met with the children in Boston on three occasions in May,
2004.

On November 16, 2004, Jose filed a complaint for civil
contempt, alleging that Sandra had violated the January 5, 2004,
order "on divers and numerous dates by failing to comply with
the evaluation model proposed by Dr. McLeod and the Children

---

[4]Specifically, Sandra sought an "instruction" that Dr. McLeod and the
Children and the Law Program not conduct the joint interview with Jose and
the children. She argued that the findings of the children's prior therapist
should be relied upon instead. Sandra also sought to exclude the findings of
Dr. Vicki Lyall, another forensic evaluator involved in the case, who alleged
that Sandra was engaged in "parent nullification."

and the Law Program." Sandra filed her answer on December 20, 2004, as well as a motion for summary judgment.

The parties appeared in court on December 31, 2004, for a hearing on Jose's complaint for civil contempt and Sandra's motion for summary judgment. The judge expressed concern at the amount of time it had taken to complete the guardian ad litem report. After some discussion, the judge indicated that there was "clearly no doubt" that Sandra was in contempt, and, sua sponte, converted the contempt complaint from civil to criminal. Trial on the criminal contempt was to be scheduled to take place at a later date. However, the judge at that point proceeded to question Sandra, without putting her under oath, about her efforts to schedule visits with Dr. McLeod. Counsel did not object. The judge then questioned Sandra's fiancé, Chris Kwiecien, regarding his relationship with Sandra and their recent activities. Once again, no objection was lodged.

On January 18, 2005, a decision was rendered, denying Sandra's motion for summary judgment and scheduling a hearing on both the criminal contempt charge and the divorce complaint for May 2, 3, and 4, 2005.

On May 2, 2005, the morning of the first scheduled day of trial, Sandra filed a motion seeking the judge's recusal from hearing the criminal contempt charge.[5] Following a hearing that morning, the motion was denied. The trial proceeded for three days, upon the conclusion of which Sandra was found guilty of criminal contempt for failing to comply with the court's order of January 5, 2004, in that she failed to permit a joint interview of Jose and the children as part of the guardian ad litem's evaluation.[6] Sandra was sentenced to 100 days in jail, suspended until May, 2006.

*Discussion.* Once the matter was converted to a criminal one, Sandra was entitled to certain protections afforded all charged with a crime. Such protections were spelled out in the seminal case of *Furtado* v. *Furtado*, 380 Mass. 137, 142-143 (1980):

[5]She did not seek to have the judge recuse himself from the other aspects of the underlying divorce action.

[6]The judgment of contempt states that Sandra "failed to forthwith comply with this Court's order of January 5, 2004, specifically including failure to permit parent (Father)/child interview as part of the guardian ad litem's protocol."

"Due process requires that the alleged contemnor be advised of the charges against him and that he have a reasonable opportunity to meet them by way of defense or explanation. The defendant is entitled to counsel if a sentence of imprisonment may be imposed and may waive counsel only as provided by constitutional principles and applicable court rules. The defendant may not be called as a witness against himself. The defendant is presumed to be innocent, and proof must be beyond a reasonable doubt. The defendant is entitled to a trial by jury to the extent provided by the Constitution of the United States or of the Commonwealth and by any applicable rule of court. Ordinarily, the criminal contempt proceeding should be held in the court whose order is alleged to have been contumaciously violated." (Citations and footnotes omitted.)[7]

The judge's questioning of Sandra, even if not under oath, was improper.[8] We note, however, that her attorney lodged no objection to the questioning and even constitutional protections may be waived. See *Commonwealth* v. *Amirault*, 424 Mass. 618, 649-650

---

[7]Concerning the right to a trial by jury, the court in *Furtado* noted, "[u]nder the Federal Constitution, no jury trial is required in a contempt proceeding unless the sentence imposed is greater than six months. . . . [W]e have never been squarely presented with the question of the extent to which the Constitution of the Commonwealth requires jury trials of criminal contempt proceedings." *Id.* at 142 n.5. Eight years later, in *Edgar* v. *Edgar*, 403 Mass. 616, 618-619 (1988), the court returned to this issue. "There is no constitutional right to a jury trial in a criminal contempt proceeding in which the penalty is six months' imprisonment or less. . . . If the defendant's case had arisen in the Superior Court, he would have the right to a jury trial; the Probate Courts, however, have no such provision. . . . The Probate Courts' jurisdiction is special and their cases are trenchantly different from those tried in the District and Superior Courts." *Ibid.* We note that Sandra did not request a jury trial and does not raise the issue on appeal.

[8]We are also troubled by the judge's questioning of her fiancé, Kwiecien, who may have had a right under the Fifth Amendment to the United States Constitution against self-incrimination, which no one apparently recognized. The judge asked Kwiecien about the nature of his relationship with Sandra, how long they had been in a relationship, and whether he was the father of Sandra's then unborn child. Although rarely prosecuted, adultery is still criminalized in Massachusetts under G. L. c. 272, § 14, which statute has been upheld as constitutional. See *Commonwealth* v. *Stowell*, 389 Mass. 171, 176 (1983). Prior to any questioning, therefore, Kwiecien should have been made aware of his Fifth Amendment rights as well as his right to confer with counsel.

(1997). Also, we have not been directed to any prejudice that she might have suffered.[9]

*Notice.* Sandra complains on appeal that she did not receive adequate notice of the charge against her. As the issue was not raised below,[10] we need not consider it here. See *Palmer* v. *Murphy*, 42 Mass. App. Ct. 334, 338 (1997) ("Objections, issues, or claims — however meritorious — that have not been raised at the trial level are deemed generally to have been waived on appeal"). Even if we were to consider it however, she would fare no better.

In order to provide sufficient notice, a charge of criminal contempt must delineate allegations that there was a "clear, outstanding order of the court, that the defendant knew of that order, and that the defendant clearly and intentionally disobeyed that order in circumstances in which [s]he was able to obey it." *Furtado* v. *Furtado*, 380 Mass. at 145. "Technical accuracy of pleading has not traditionally been required in contempt cases, but the alleged contemnor should be advised of the charges and have a reasonable opportunity to meet them by way of defense or explanation." *Fay* v. *Commonwealth*, 379 Mass. 498, 502 (1980), quoting from *Katz* v. *Commonwealth*, 379 Mass. 305, 312-313 (1979).

Here, Jose's complaint for contempt alleged that Sandra had violated the January 5, 2004, court order "on divers and numerous dates by failing to comply with the evaluation model proposed by Dr. McLeod and the Children and the Law Program." Sandra was present at the December 31, 2004, hearing in which the matter was converted from a civil to a criminal contempt. Following that hearing, the judge issued an order on January 18, 2005, clearly indicating the change from civil to criminal

---

[9]The judge asked Sandra eight questions, relating to when she called Dr. McLeod, and her plans to travel to Boston from Iowa, where she was enrolled in school. At trial, Sandra did not testify and the judge denied Jose's motion to introduce her deposition testimony taken in the underlying divorce case. Jose relied on Dr. McLeod's testimony regarding when Sandra called, and introduced telephone records in support thereof. He also produced evidence, through Kwiecien, of the number and duration of trips Sandra made to Boston from Iowa.

[10]Jose notes that Sandra never raised the issue of notice before the trial court. Our review of the record indicates that no objection was made and Sandra does not state otherwise in her reply brief.

contempt. Sandra had roughly three and one-half months from that point until the commencement of the trial on May 2, 2005, to prepare her defense. In these circumstances, Sandra had sufficient notice of the charge against her, see *Furtado* v. *Furtado*, 380 Mass. at 145, and adequate time to prepare a defense.

*Applicability of Mass.R.Crim.P. 44(c).* Sandra argues that "[j]udicial deference to Mass.R.Crim.P. 44(c)[, 378 Mass. 920 (1979),] in the circumstances of this case required allowance of the motion for recusal." Rule 44(c) states: "The contempt charges shall be heard by a judge other than the trial judge whenever the nature of the alleged contemptuous conduct is such as is likely to affect the trial judge's impartiality."

We first observe that Sandra's conduct was not personal to the judge and therefore was not likely to affect the judge's impartiality. See *Berlandi* v. *Commonwealth*, 314 Mass. 424, 453 (1943).[11] Moreover, the parties direct us to no authority addressing the applicability of rule 44(c) to criminal matters arising in the probate court. *Furtado* v. *Furtado*, 380 Mass. at 152, mentions rule 44(c) only in passing. In *Edgar* v. *Edgar*, 403 Mass. 616, 618, 620 (1988), after discussing the criminal contempt defendant's lack of right to a jury trial in probate court under Mass.R.Crim.P. 44(a), 378 Mass. 920 (1979), the court concluded, "we are satisfied that nonapplication of rule 44 to parties in Probate Court proceedings is reasonable." We will not belabor the point, however, as the issue presented here is whether the judge should have recused himself, a matter not raised in *Edgar*. We thus turn our attention to that question.

*Recusal.* Sandra argues that the comments and conduct of the

---

[11]*Berlandi* v. *Commonwealth, supra,* concerned a contempt case in which the defendant was alleged to have attempted and conspired to influence a judge. The judge who heard the contempt trial was the same judge whom the defendant had attempted to influence (and who witnessed some of the contemptuous actions while on the bench). The court ruled the judge did not have to disqualify himself, stating that his judicial knowledge of the case did not affect his impartiality. *Id.* at 443-445, 453-454. The court further noted that the contempt was not personal to the judge, explaining: "In a proceeding for contempt the court is not a party. There is nothing that affects the judges in their own persons. Their concern is only that the law should be obeyed and enforced, and their interest is no other than that they represent in every case." *Id.* at 453 (citation and quotation marks omitted).

judge during the December 31, 2004, hearing indicated not only a bias, but a prejudgment of the matter. Generally, recusal is a matter left to the discretion of the judge. *Commonwealth* v. *Gogan*, 389 Mass. 255, 259 (1983). See *Fogarty* v. *Commonwealth*, 406 Mass. 103, 110-111 (1989), *S.C.*, 419 Mass. 456 (1995). When faced with a motion to recuse, a judge must "consult first his own emotions and conscience" and, if he "pass[es] the internal test of freedom from disabling prejudice, he must next attempt an objective appraisal of whether this [is] a proceeding in which his impartiality might reasonably be questioned." *Commonwealth* v. *Gogan*, 389 Mass. at 259, quoting from *Lena* v. *Commonwealth*, 369 Mass. 571, 575 (1976) (quotation marks omitted).

The record reflects that the judge engaged in such an inquiry. He heard the parties and then retired to his chambers to reflect upon the motion. Upon his return to the bench, he denied the motion, having previously asserted that he harbored no bias toward either party, and had formed no opinion on the charge of contempt. The judge was inwardly satisfied that he could be an impartial trier of fact and, therefore, met the first prong of the two-part test.

The judge was clearly frustrated by the extreme delay in completing the evaluations, and words he uttered from the bench reflected those feelings. When considering whether to convert the contempt to a criminal action, the judge did say, regarding Sandra's relocating with the children to Iowa, "there's clearly no doubt in January until she returned, she was in contempt." A reading of the record as a whole, however, belies Sandra's claim that the judge had predetermined her guilt. The judge repeatedly stated that he would hold an evidentiary hearing on the criminal contempt at a later date. In fact, his comment that Sandra was "clearly in contempt" occurred amid discussion of what he would have to find to hold her in contempt, what the evidence at trial might show, and what arguments for and against contempt existed. When defense counsel disagreed with the assessment that the evidence would show her in contempt, the judge responded he would "give [her] an opportunity" to dispute it at trial.[12] Con-

---

[12]Needless to say, as in every criminal case, the burden is never upon the defendant, who has a right to remain silent throughout the proceedings. Concomitant with this right is the opposite one — the defendant's right to be

sidered in context, the isolated comments cited by Sandra are insufficient to require the judge's disqualification.[13]

Further, and most troubling, is the fact that the recusal motion was filed on the morning of trial, four months after the December 31, 2004, hearing upon which it was based. During that interval, forty-six entries appear on the case docket, including at least ten filings by Sandra. She also unsuccessfully pursued two motions to continue the contempt trial.[14]

It is well established that "one seeking the disqualification of the judge must do so at the earliest moment after knowledge of the facts demonstrating the basis for such disqualification." *Demoulas* v. *Demoulas Super Mkts., Inc.* 428 Mass. 543, 548-549 (1998), quoting from *United States* v. *Kelly,* 519 F. Supp. 1029, 1050 (D. Mass. 1981). Given the eleventh hour filing and the fact that recusal would have resulted in further delay of an already drawn out proceeding, the judge was within his discretion, after applying the two-step test, to deny the motion to recuse. Also of significance was Sandra's satisfaction with the judge deciding the other aspects of the divorce action.[15]

*Sufficiency of evidence of contempt.* Sandra argues that the

heard, to present evidence, and to testify, if so desired. The judge's comment that Sandra would have that opportunity at trial was in response to defense counsel's arguing the question at the December 31, 2004, hearing.

[13]Sandra also finds fault with the judge's stating, "I don't give a damn," during the December 31, 2004, hearing. Placed in context, however, the statement is not as problematic as she would have us believe. The entire statement reads as follows: "I'm hoping that I won't have to impose serious sanctions, but I'm going to tell you, notwithstanding the birth [o]f your child, which I hope is healthy and without incident, but I am going to tell you, *if I find* that any of this action taken up to now is contumacious — and that is [with] full knowledge of my order — and I don't give a damn, I promise you I will impose serious sanctions — serious sanctions, not only monetary, they will be very serious" (emphasis added).

[14]While the docket indicates one written motion for a continuance was filed on April 25, 2005, a second oral motion to continue was also apparently raised prior to trial.

[15]Sandra also alleges that the judge became improperly familiar with disputed matters before the contempt trial. She has not, however, provided sufficient evidence that the judge obtained such information from an extrajudicial source. See *Commonwealth* v. *Leventhal,* 364 Mass. 718, 722 (1974) ("to be disqualifying, the bias and prejudice must rise from an extrajudicial source and not from something learned from participation in the case").

evidence did not warrant a finding of guilt on the charge of criminal contempt and that the judge erred in denying her motion for a required finding of not guilty. Since the proceeding was criminal in nature, proof beyond a reasonable doubt was required to show that (1) there was a clear, and unequivocal order; (2) Sandra knew of the order; and (3) she intentionally disobeyed the order. See *Shaw* v. *Commonwealth*, 354 Mass. 583, 586-587 (1968); *Furtado* v. *Furtado*, 380 Mass. at 150.

The judge's order of January 5, 2004, was clear, unequivocal, and in effect throughout the period considered by the judge. Similarly, there is evidence that Sandra knew of the order. The order was issued upon Sandra's motion for instructions. She was not only present for that hearing, but was provided with a copy of the written order by her attorney and the court.

The issue thus boils down to whether Sandra wilfully disobeyed the order. At trial, Dr. McLeod testified that she called Sandra three times during the week of January 26, 2004, once each on February 15 and 20 and March 27, 2004. Dr. McLeod further testified that "[m]y message machine states clearly that I'm in the office on Tuesdays and Wednesdays, and I left her a message saying specifically that it would be easiest for us to arrange the times for the interviews if she would try calling me on a day when I was present." Sandra's telephone records, which were introduced at trial, indicate that notwithstanding these instructions, she called Dr. McLeod on Thursday, January 22, 2004, at 7:32 P.M., Friday, February 13, 2004, at 6:33 P.M., and Tuesday, February 24, 2004, at 7:16 A.M.

Kwiecien testified that he, Sandra, and her children resided in Iowa from January, 2004, until March or April of 2004, and that they made several trips back to Massachusetts during that interval. Although each of these trips was around four or five days in length, Sandra did not schedule an evaluation with Dr. McLeod on any of those occasions. In fact, Dr. McLeod was unable to interview the children until May of 2004, nearly two years after she had been appointed guardian ad litem.

Given the evidence before him, the trial judge was justified

in finding that Sandra wilfully disobeyed the court's unequivo-cal January 5, 2004, order; one which she had the ability to obey.[16]

*Judgment affirmed.*

.

---

[16]Having so concluded, we are somewhat puzzled why resort to criminal contempt was made, when it appears that action on Jose's motion for civil contempt would have produced a similar result.